**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,      )<br>    Petitioner,                             )<br>                                                )<br>    v.                                           )<br>                                                )<br>CHARLES MURPHY,                    )<br>    Defendant,                      )<br>                                                )<br>   and                                       )<br>                                                )<br>PATRICIA MURPHY and UBS       )<br>FINANCIAL SERVICES, INC.,        )<br>                                                )<br>   Third-Party Citation Respondents.   ) | Case No. 07 CR 853-7<br><br>Judge Ronald A. Guzmán |

**MEMORANDUM OPINION AND ORDER**

For the reasons stated below, the government's motion for entry of judgment on its petition for relief against Patricia Murphy [788] is granted. The government is directed to submit a proposed order to the Court. The government shall send a copy of the proposed order to Patricia's counsel prior to submitting it to the Court, and shall include with its submission to the Court a statement as to whether the proposed order is agreed as to form and briefly setting forth the substance of any objections.

Charles Murphy was charged with six others in a Fifth Superseding Indictment alleging various combinations of wire and mail fraud, engaging in monetary transactions with property derived through unlawful activity, and theft of public funds. He pleaded not guilty. In December 2011, after a nine-week trial, the jury returned guilty verdicts against Murphy and all but one of his co-defendants. (Stip. Facts, Dkt # 719, ¶ 10.)

On July 11, 2012, the Court entered judgment in favor of the United States and against Murphy ordering him, in part, to pay restitution in the amount of $656,290.00, which remains unpaid. (*Id.* ¶ 11.) This amount represents losses associated with eleven properties, which occurred during the time period of April 2002 to October 2004. At sentencing, Murphy provided financial records indicating that his net worth was $68,765.00 (PSR, l. 578.) On September 27,

2012, a citation to discover assets directed to defendant's spouse, Patricia Murphy ("Patricia"), and UBS Financial Services, Inc. ("UBS") issued. On October 11, 2012, the government recorded its notice of lien under 18 U.S.C. 3613(c) against the defendant's property rights and property. (Stip. Facts, Dkt. # 719, ¶ 13.) Unlike an ordinary judgment lien which when recorded simply binds real property, a § 3613 judgment lien extends to both real and personal property. *United States v. Swan*, 467 F.3d 655, 656 (7th Cir. 2006) (citing 26 U.S.C. §6321; applying tax lien principles to a § 3613 judgment). The judgment lien is entitled to priority vis-a-vis other lien creditors when properly recorded. *See* 18 U.S.C. § 3613(d).

On November 27, 2012, pursuant to the citation, Patricia appeared for examination and testified that: she and her husband originally established the account at UBS as a joint account in both of their names; the account was established with and maintained by the earnings of Murphy; Murphy took his name off the UBS account in 2005 and at approximately the same time transferred the family residence, which had been titled in both their names since 1977 and was free of any mortgage, into Patricia's name alone; and no consideration was given for either of these transfers. (Stip. Facts, Dkt # 719, ¶¶ 28(b), (e), (f).) As of May 31, 2013, the balance in the UBS account, which at that time was in Patricia's name only, was valued at approximately $773,000.00. (*Id*. ¶ 3.)

On June 3, 2013, the government filed a motion for turnover order directed to UBS, which alleged that pursuant to § 3613(c), upon entry of the judgment against Murphy, a lien arose on all of Murphy's property and rights to property. The government demanded that UBS turn over $656,665.00 from Patricia's UBS account, the amount owed pursuant to the judgment of July 11, 2012. According to the government, the money in Patricia's account at UBS was the result of a 2005 fraudulent transfer from Murphy to Patricia. Section 3304(b)(1)(A) of the Federal Debt Collection Procedure Act ("FDCPA") provides that "a transfer made . . . by a debtor is fraudulent as to a debt the United States, whether such debt arises before or after the transfer is made . . . if the debtor makes the transfer . . . with actual intent to hinder, delay, or defraud a creditor." 28 U.S.C. § 3304(b)(1)(A). The FDCPA "enables the Government to seek relief from fraudulent transfers and to collect criminal debts owed to the Government." *United States v. Schippers*, 982 F. Supp. 2d 948 (S.D. Iowa 2013).

Under the FDCPA:

>           (2) In determining actual intent . . . , consideration may be given, among other factors, to whether--
>
>>          (A) the transfer or obligation was to an insider;
>
>>          (B) the debtor retained possession or control of the property transferred after the transfer;
>
>>          (C) the transfer or obligation was disclosed or concealed;
>
>>          (D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
>>          (E) the transfer was of substantially all the debtor's assets;
>
>>          (F) the debtor absconded;
>
>>          (G) the debtor removed or concealed assets;
>
>>          (H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
>>          (I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
>>          (J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
>>          (K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

28 U.S.C. 3304(b)(2)(A-K). It is not necessary to satisfy all the so-called "badges of fraud" to conclude that a fraudulent transfer has occurred. *Brandon v. Anesthesia & Pain Mgmt. Assocs*, 419 F.3d 594, 600 (7th Cir. 2005) (badges of fraud "are not additive"). Finding just one badge of fraud might "be quite sufficient to entitle the plaintiff to relief." *Id.*

Prior to Murphy's transfer to Patricia of all of the assets in the UBS account, the following events occurred. On December 22, 2004, federal law enforcement agents executed a search warrant against premises controlled by Murphy's co-defendants, Robert Brunt, Tracey Scullark, and Armani D'Aifallah, in what was then an on-going, non-public, mortgage fraud investigation. Materials recovered by the search became part of the evidence that would eventually be used by the government in the successful prosecution of Murphy and his co-defendants.

On December 22, 2004, Scullark called Murphy while federal agents searched one of the premises. The following day, December 23, 2004, as a part of the same investigation, two federal law enforcement agents served Murphy with a grand jury subpoena for his records and interviewed him. During this interview, Murphy asked whether he was a target of the investigation and was told that he was not.[1] Among the subjects discussed during this interview were the Genesis Investment Group (co-defendant Brunt's corporation) and Evergreen Mortgage Services (co-defendant D'Aifallah's employer), the activities of Brunt, Scullark, and D'Aifallah, and the sale of the property commonly known as 1012 East 41st Street, Chicago, Illinois. The 41st Street property was one of the eleven properties for which Murphy would, after his conviction, be ordered to pay restitution. (Stip. Facts, Dkt. # 719, ¶ 15.) Thus, as of December 24, 2004, at least, Murphy was aware that the property transactions he was involved in, which he knew were fraudulent, as well as his associates in those transactions, were being investigated by federal authorities.

At the hearing on the government's motion for a turnover order, Patricia testified that at some point that same month, December 2004, Murphy told her only that he had been visited by an agent of the IRS at his office, but that the visit had nothing to do with him. According to Patricia, she simply replied, ". . . Oh. And that's -- that was the end of the conversation." (12/11/13 Hr'g Tr., Dkt. # 778, at 50.) Patricia's testimony regarding her conversation with Murphy is implausible. First, it is not clear why Murphy would not tell his spouse the entire truth, *i.e.*, that the purpose of the visit was to serve him with a subpoena for his records regarding certain real estate transactions he was involved in and that his business associates in those transactions had also been subjected to search warrants. Moreover, after having been told, as she testified, that the visit had nothing to do with him, why would Patricia not ask the logical follow-up question – "what then was the visit about?" Instead, she testified that no more was ever said about the subject matter. (*Id*. at 51.)

---

[1] This information, that he was not presently a target of the government's investigation, could not have been very comforting to Murphy. As an experienced criminal defense attorney, he knew that this status could change from one day to the next. In fact, knowing what he did about the information contained in the subpoenaed records and his own role in the fraudulent scheme, Murphy had good reason to believe that it was only a matter of time before he was a target.

Page **4** of **9**

The IRS investigation continued and approximately five months later, on May 10, 2005, U.S. Deputy Marshals arrested D'Aifallah on a criminal complaint, case number 05 CR 414 (N.D. Ill.), which was a forerunner to the indictments returned in this case. Because many of the people interviewed during the continuing investigation were involved in Murphy's fraudulent real estate investment business and D'Aifallah, a key figure in this case, was actually arrested on a federal criminal complaint charging him with mortgage fraud, it is extremely unlikely that Murphy, an experienced and knowledgeable criminal defense attorney, was unaware that his real estate transactions and partners were at the center of a major federal criminal fraud investigation at that time. Murphy also would have been aware that one of the penalties provided by federal law for a financial fraud conviction was a judgment of restitution and/or a fine which, upon entry, resulted in a lien on a defendant's "property and rights to property" extending to both real and personal property. In short, given his extensive investment and involvement in the transactions being investigated and his expertise in criminal law, Murphy must have known that everything he owned would be at risk if the ongoing investigation resulted in his indictment and conviction for criminal fraud. Thus, by May 2005, if not before, he had a strong motive for protecting his assets from any possible judgment against him.

Records show that as of at least April 1990, Charles and Patricia owned a joint investment account with UBS. In the account application form, Murphy was named the account's "Primary Individual Owner" and Patricia was designated as the "Joint-Party/Spouse/Custodian/Guardian/ Executor." The application form lists the "Account Name" as "Mr. Charles and Mrs. Patricia Murphy JT TEN WROS" (the "Murphy Joint Account"). On December 14, 2005, the entire value of the Murphy Joint Account, $481,658.00 in cash and securities, was transferred to an account owned by Patricia alone. (Stip. Facts, Dkt. # 719, ¶ 18.) Thus, within months of D'Aifallah's arrest, and as the investigation into the widespread fraudulent mortgage loan scheme continued and expanded, Murphy, a major player in that fraudulent scheme, divested himself of any legal ownership of funds he had owned jointly with his wife for approximately 15 years. A month before that, on November 16, 2005, Murphy quitclaimed to Patricia all of his interest in the couple's marital residence on the 11200 block of South Spaulding Avenue in Chicago, Illinois. (*Id.* ¶ 19.) The home had been owned by the married couple in joint tenancy since 1977. (*Id.*) Absolutely no consideration was given in exchange for these transfers of cash and property worth approximately $800,000. Absent a

believable explanation for this abrupt change in the long-standing joint ownership of property and money accumulated over the many years of their marriage, the obvious conclusion is that Murphy was attempting to insulate his wealth from the consequences of a possible future criminal conviction.

On December 11, 2013, during an evidentiary hearing on the government's motion for turnover order, Patricia gave an explanation for the transfer of all of the marital wealth to her alone. The transfers, she testified, were the result of her demand that Murphy transfer to her name all their accumulated wealth in order to safeguard it from the possibility that Murphy's real estate transactions would lead to bankruptcy. (12/11/13 Hr'g Tr., Dkt. # 778, at 54.) Patricia testified that her fear of bankruptcy came from a prior business venture Murphy was involved in years ago that resulted in a bankruptcy. (*Id*. at 52, 55.) She testified that she warned Murphy against investing in real estate and demanded that he transfer what she considered to be her retirement fund solely to her name or she would file for divorce. (*Id*. at 52, 54.) According to Patricia, she had several conversations with Murphy about this issue at the end of November of 2005. (*Id*. at 53.)

Patricia's testimony about these conversations lacks credibility for several reasons. First and foremost, she does not state why it was at that precise moment in time, the end of November of 2005, that she became so concerned with the possibility of a bankruptcy. Murphy had been investing in real estate since at least September 2002. If the riskiness of his investments were of such concern to Patricia, why did she wait three years before confronting him about the issue? More specifically, why were her fears not aroused sometime before search warrants were executed against premises controlled by Murphy's co-defendants, her husband's records were subpoenaed by the IRS, and his mortgage broker was arrested? To raise the possibility of divorce with her husband of more than thirty years is an extreme measure. Yet the only explanation given for the timing of this ultimatum is her belief that what started out as a one-time real estate investment, "all of a sudden . . . bec[ame] more and more and more. . . ." (*Id*. at 52.) This is hardly an adequate explanation.

There does not appear to be any acute financial crisis that triggered Patricia's sudden fear. On the contrary, Murphy's real estate transactions were doing very well and he was making a substantial profit from his real estate business during this time period. (*Id*. at 29-30.) Patricia

offered no testimony that her husband's business practices had changed in any way over the preceding three years, he had suffered losses, or was taking unusual risks in his real estate investments at that particular time. The federal fraud investigation, on the other hand, was not going away; indeed, quite the contrary.

The Court also is left with no explanation as to Murphy's motive for agreeing to this unusual request – the end result of which was to voluntarily hand over to Patricia almost all he had worked for during his entire career, and it is Murphy's motive that controls here. While the threat of divorce might certainly provide such a reason, at the very least, one would think that Murphy would want to keep his fair share of these assets. They were, after all, owned jointly. Furthermore, though he was primarily a criminal defense attorney, Murphy had to know that he could insulate his personal fortune from mere bad business decisions by incorporating his real estate investment business. This was a quick and easy solution to his spouse's concerns and would not require divesting ownership of most of his assets. Yet, Patricia makes no mention whatsoever of any other alternative solutions ever being discussed. On the other hand, if Murphy had reason to believe he faced a criminal investigation which, if successful, could deprive him of twice his gross earnings from his fraudulent real estate transactions, then his motive for transferring the assets to someone else would be clear. By November 2005, Murphy knew his close associates in many if not all of his real estate transactions were being intensely investigated and even arrested for criminal conduct surrounding their joint fraudulent real estate transactions. He also knew his real estate transactions were fraudulent and that he was vulnerable to prosecution. Even if the Court were to find Patricia's explanation believable, which, for the reasons pointed out above, we do not, it is not her intent that is at issue here.

The Murphys continued to collaborate in financial affairs in order to carry out their joint interests. Apparently, Murphy continued to pay for their living expenses and on at least one occasion, Patricia loaned Murphy $20,000.00 from her now sole account for a short time (four days) so he could close on a real estate transaction. On another occasion, the Murphys sold a Mustang automobile in their joint names for $14,000.00, which was deposited in their joint account at First Midwest Bank but later moved to Patricia's account at UBS. According to Patricia, the purpose of this transaction was not to shield money or assets, but to allow their daughter to purchase the Cadillac she was leasing, which she now needed only on the weekends.

The Cadillac was purchased with money from Patricia's sole account and put in her and her daughter's name, not Murphy's. When asked why, Patricia indicated that she did not believe it was necessary to put Murphy on title. Thus, the Mustang, which was joint property, was liquidated and the proceeds run through Patricia's UBS account and used to purchase an automobile in which Murphy had no title, but which he used as if it were his own. An asset which would have been subject to seizure thus became protected. It is evident that Murphy had substantial access to Patricia's funds when he needed money, and there was at least some flow of assets or value from his name into Patricia's account. It is also clear that Patricia was willing to use the account in her sole name to help Murphy hide assets.

The Court does not find Patricia's explanations for the transactions discussed above credible. Ultimately, Murphy could easily have protected his and Patricia's assets from bankruptcy by incorporating his real estate business and segregating his business capital from his personal income and assets. Such a transaction would have eliminated Patricia's concerns without the need for convoluted transferring of funds and titles. Murphy instead chose to transfer the great bulk of his wealth to his spouse in order to shield his assets from seizure in the probable criminal case against him.

For the reasons stated above, the Court finds that Charles G. Murphy's transfer on December 14, 2005 of his interest in the UBS Resource Management Account held in joint tenancy with right of survivorship in the names of Charles G. Murphy and Patricia M. Murphy to UBS Resource Management Account No. CG 56341-63 in the sole name of Patricia M. Murphy was a fraudulent transfer devoid of consideration and executed solely for the purpose of avoiding the anticipated Judgment of July 11, 2012.

The government is directed to submit a proposed turnover order to the Court forthwith. The government shall send a copy of the proposed order to Patricia's counsel prior to submitting it to the Court, and shall include with its submission to the Court a statement as to whether the proposed order is agreed as to form and briefly setting forth the substance of any objections.

**Date**:  May 20, 2015

_____
**Ronald A. Guzmán**
**United States District Judge**